Because of Dave McClure's speech, which the District Court below conceded to be protected by the First Amendment, the Maryland Transit Authority, the defendant officers in this case, revoked his right to show up at grievance hearings unless they had their approval. Grievance unless Dave McClure and President Hanley of the International Union, this is set out in a letter of December 8th by Defendant Louis Jones, unless Mr. McClure and President Hanley agreed to meet with MTA and give assurances that Dave McClure would conduct himself professionally, they were going to deny his right to access unless he asked for permission. And there were no standards as to whether or not this permission was going to be granted. The District Court conceded- Judge McClure Would a collective bargaining agreement say that permission would be required and that the agency was required to make every effort to cooperate for the granting of permission? Mr. Hanley That collective bargaining agreement provision applied to union business where the union was on the employer's property talking to its own members or conducting a union election. It had never been applied to employer business. The union came on to do the business of the employer. Judge McClure Would going to the grievance hearing be part of his union responsibilities? Mr. Hanley Going to the grievance hearing is part of his union responsibilities, but it's also a business that is being conducted with the employer. But in any case, Your Honor, the employer is opening up its property and had traditionally and consistently opened up its property for grievance hearings. And that, even if it had the right to take away what had been absolute ironclad custom, people showed up at grievance hearings and did their own, that would still be discriminatory intent. Judge McClure Wait one second, because I think Judge Agee's point is everybody agrees that they opened up their property for the grievance hearing. The question is not whether it's open. The question is whether you had to get prior permission or not. And so there's no doubt that it was open and that they had to engage in good faith efforts to permit it. But what the CBA requires is permission. Judge Agee The CBA requires not permission for this type of business. And that's, we didn't get any discovery. Mr. Hanley What is the language of the CBA? Point me to what language in the CBA limits that provision from applying to this type of what? Judge Agee From our point of view, there's no language in the CBA that limits that provision. What the provision speaks to specifically is union business that is conducted on the employer's property. And that had been union elections and so forth. Mr. Hanley But we read that, you're asking us to read that in as additional language to the CBA. Judge Agee Even if they had the right to exclude it, they can't do it for retaliatory purposes. That's point number one. Point number two, this was approved by the employer. Remember, the employer scheduled this grievance hearing with the union. The union had been approved for this purpose. Now, they're trying to read it as to say that Dave McClure had to be approved specifically. Other union officers can come and go, right? There was no bar from them. But Dave McClure only was singled out. And the provision that you're talking about is refers just to union business that is Mr. Hanley What is Mr. McClure claiming that he wants to do that's not union business? Judge Agee Your Honor, what he was trying to do was he was representing his members in grievance hearings. That's not union business. That's employer business. The employer and the union both are obligated by that collective bargaining agreement to meet and confer. That's a legal obligation. Mr. Hanley I understand what you said, but I'll have to say to me, and I certainly wasn't a labor lawyer, to say that the union president who's there to take part in a proceeding where there are union members and there's business that relates to the collective bargaining agreement is not union business. This doesn't make any sense to me. Judge Agee Well, the main point here is that the union did get approval. It was approval for the union to conduct the grievance hearing. And the MTA opened up its property. MTA scheduled the grievance hearing on the property with the local. If that provision applied even to employer business, the union had the permission. It wasn't the collective bargaining agreement provision here just didn't apply to that particular kind of conduct. Mr. McClure So your argument is, in essence, once the hearing is scheduled, then anybody from the union can show up for that hearing. Your reading of the CBA is that that provision doesn't require approval for individuals to show up. It's like union-wide. Judge Agee Of course. And there's no reference in that provision. Ms. Laird Excuse me. If there was a nondiscriminatory reason for adopting, for barring someone, you can see in the district court that the MTA would have been within its rights, right? Judge Agee If there was a nondiscriminatory reason, that's correct, except in the situation where if they are claiming unbridled discretion to determine who can represent the local at a grievance hearing that is held on MTA property, that's a stigmatizing and damaging thing just for the local. Ms. Laird Your concession in the district court was that if there's a nondiscriminatory reason, they can, which certainly seems to me is not much of a concession, you have to concede that. Judge Agee If there's a nondiscriminatory reason, yes, demonstrated nondiscriminatory reason. But this is unbridled. They don't have to give a reason. Ms. Laird Why do you think that past practice gives you some sort of contractual access right then? Judge Agee Your Honor, first of all, the collective bargaining provision doesn't apply to this sort of situation. It applies to like union elections. It applies to Dave McClurk going onto the union property and saying to his members, hey, are there any safety hazards? That's union business. That's business that purely concerns the union. This was business that concerns the employer. That provision didn't apply. Mr. McClurk Well, if it only concerned the employer, then the union didn't need to be there. I mean, I don't understand that argument, frankly. Judge Agee Well, of course the union had to be there, but the employer had an obligation to meet with the union. It had an obligation under the collective bargaining agreement to hear grievances. Mr. McClurk Why don't we move beyond that point, because I think there's room to pass  Ms. Laird Yeah, we might want to bracket that argument and move to the next one. Judge Agee Even if that applied, and it doesn't, and we never got the right to take discovery on what the past practice was, and we would have shown that conclusively, even if that applied, even if it applied, they can't use that right to discriminate or retaliate because of speech. And the district court agreed they're doing this because they don't like what he's saying. And what he was saying, and it's worth thinking about this for a second, what he was saying was Mr. McClurk They would agree for purposes of argument at the hearing there was an improper motive and it all came down to, well, was this a de minimis restriction? Judge Agee Of course. But here is the point. The law in this circuit is, in child evangelism fellowship, and it's the law in every circuit so far as I can tell, is when the government makes a claim of unbridled discretion to keep someone in or out of a public property, and it is an inherent chilling effect. But there's a big difference between this case in child evangelism fellowship, which applied that doctrine even in a nonpublic forum, even in one where the government had the right to exclude the speaker. The big difference is that in this case, unlike child evangelism fellowship, it's stipulated virtually by the district court that the purpose of this was to get back at Dave McClurk because of a speech and the union because of a speech. The speech about the safety hazards in the Baltimore metro, the link, the speech which is collective bargaining speech protected by the First Amendment by Janus. I say, OK, we'll accept that. Let's move on to the de minimis argument. Judge Agee Well, unbridled discretion means it inherently intimidates people into censoring themselves. That's one wrong. The second is that it stigmatizes in this case, and this is a different kind of injury than in child evangelism, it stigmatizes Dave McClurk and the local. It shows that they can't pick who's going to represent them. It discredits them in front of their membership. Only Dave McClurk was singled out. Other officers could come in and out. He is, to use the street term, dist, basically, in a way that is very demoralizing to the local, the local membership, and interferes with their right to have their own advocate in there speaking for them. And finally- Judge Agee Did he ever ask for permission to attend any event? Judge Agee No, not specifically, but that's because if he had started down that road, he would have been in a trap. Remember, they're saying, oh- Judge Agee That's a very different case. He didn't ask for permission and the employer refused it. Judge Agee Yeah, of course, but it also increases his injury just by asking, and that's the problem with unbridled discretion. You go in there and you start saying, well, maybe I'll regulate my speech in this way or not. Remember, they had no standards as to how they were going to admit him. They just said, look, if you want to come in, effectively, and this is how we read it, curb your speech. And if you don't curb your speech, well, maybe you'll get in, maybe you won't. Just ask us, what standard were they going to use? What standard were they- they just told him that speech was the key. And aside from the danger of self-censorship, aside from that danger, he really would have discredited himself with his- imagine if he had done that and been denied. I mean, that would really discredit him with his membership. And there is just a general problem here in allowing the government to act in this arbitrary way, especially- Justice Breyer Well, but you haven't- you haven't shown us- I mean, this is one of the challenges- you haven't shown us that they're- they did or would have acted in an arbitrary way. I mean, that's the problem that Judge Agee recognizes, is that if you don't ask permission- so imagine this scenario, and I'm not- this is a hypothetical, right? But they say, listen, this guy McClure, you know, we find him to be problematic. And he's problematic because he threatened one of our hearing officers. And so in order for that hearing officer to have a safe and comfortable work environment, we need to have an armed guard in the room whenever this McClure guy shows up. Maybe that's a good decision, maybe it's a bad one, but that's part of their relations with their hearing officer. And so they say, listen, we want McClure to get permission, not because we're going to deny it. In fact, we're going to give it to him every single time. But when he asks for it, so we know in advance he's coming, we can have a hearing- a guard that's in the room with him, so that if he starts to verbally or otherwise assault this woman who has complained about it, that we can- we can have somebody there to protect her. But that seems eminently- that's a hypothetical. I'm not saying it's this case, but if that was the hypothetical, your argument is can't do that either, right? Well, if- That would be awfully stigmatizing if that's what the employer did. No, in what the employer did- Having a police officer there at the hearing only when he shows up isn't going to be stigmatizing to this union president? Your Honor, what the employer did for purpose of this appeal is they engaged in a reprisal against him because of speech. He would not have had the right to speak if made a true threat. He would not have had the right to speak if he had thrown over the tables and engaged in profanity and made a physical threat. What's been conceded here and what this Court has to accept is he engaged in legitimate First Amendment speech. And I'm not disagreeing with that, but I'm saying he makes First Amendment speech, but he does so in a way that a hearing officer, in my hypothetical, reasonably believes is threatening, demeaning, and demoralizing and says, listen, I'm not going to be there without somebody to protect me, right? I want a courtroom deputy that's going to be there anytime he's there. And as a result of that, MTA says, listen, you know, you got to get permission because we have to arrange in advance to have somebody there because we find you, frankly, to be threatening. Not we, but this particular hearing officer. And it's our obligation to provide a safe work environment for everybody. And this is the balance that we strike. This isn't an attack on First Amendment rights. This is a protection of the work rights for our hearing officers. Well, there would have to be the least restrictive means consistent with First Amendment rights. But I just have to say, Your Honor, with all due respect, I just reject that hypothetical for this case. I know, but you agree that that hypothetical, you agree, your view is that hypothetical also violates his First Amendment rights. If he engaged in some violent activity, he wouldn't have First Amendment rights. I'm saying he engaged in exactly what happened here. Oh, no, no. What happened here is that he... I'm saying he engaged in what happened here. Not what the state did, but what he did is the same in the hypothetical. Yes, what he did... So is there anything wrong with the armed guard? I'm not sure what else he's done in the hypothetical, but... He's done everything he did here. He, your client, has done everything. It's exactly the same. Well, he didn't engage in any kind of violent activity. He says that, but the hearing examiner was, I think the record's undisputed, unhappy about it and feeling threatened. Yes, she was unhappy. So we have the employer of the hearing examiner hearing from this employee, and in response to that, the employer takes this action. Your Honor, I'm out of time. No, you can answer the question. Okay. The answer to the question is that if he crossed the line and engaged in some violent activity... We have exactly the same facts of what he did here, and what we're saying to you is the only thing that's changed is what the employer did, and the employer did because we're going to make... He doesn't have to be somebody from the police, but we're going to put one of our guards in there because all state agencies now have guards. We're going to have one of our guards in there to sit during the hearing. I think that would have been... Because this makes the hearing officer more comfortable. No. Would that be a violation of his First Amendment rights? Yes, it would be if the facts were as we have alleged them in this complaint, because there wasn't a legitimate basis. They never identified a specific threat against her. All they said, and I'm sorry I didn't have time to get into this in the oral argument. All he said, and this is what everybody agrees, he came in and tried to withdraw a grievance. He tried to withdraw a grievance, and she wouldn't let him talk. She said, we're going to have the grievance hearing anyway. He said, I'm trying to tell you he's withdrawn the grievance. He never got it out, and she said, sit down, shut up. You're going to have this grievance hearing. He said, you don't know how to run a grievance hearing. That's not the basis for an employer to put an armed guard in the room. This is not a hearing officer. This is not a neutral person, by the way. This is a management representative, low-level management representative, step two grievance hearing, not a neutral. The employer, it was such a contrived setup, and it was legitimate First Amendment collective bargaining speech for him to do it. Remember, the Supreme Court has opined in the Lynn versus Plant Guards case and in New York Times versus Sullivan about collective bargaining. The court said, look, in collective bargaining speech, intemperate and abusive speech is common. That's what people do in collective bargaining. They bang on tables, et cetera, et cetera. It goes on all the time. This is just hypocritical. I think I understand that argument. I interrupted you, so you have a few more minutes. If I may say just one more thing, it shouldn't be lost on the court that Mr. All he said was, you don't know how to run a grievance hearing. That's all he said. It shouldn't be lost that this is a very large, loud African-American male. And to come in and come back and try to slime him like this is really outrageous. And it was because of his speech, because of what he was doing publicly, shaming MTA. And I know that the court wants to sort of go past this. But they exposed extremely serious safety hazards, which have been on the front pages of the Baltimore Sun and other papers. And these defendants were really, really, really mad at him. And if the court takes this case out of that context and out of the district court's The district court knew they were mad at him. They knew. He knew that they were mad at him because of his speech, and he conceded that. That's what this case is about. And it's unbridled discretion plus an admitted retaliatory intent. That's adverse effect. And that's why this case should be reversed and sent back for further proceedings. Thank you. Good morning, your honors, and may it please the court. The Maryland Transit Administration's non-public areas constitute safety-sensitive workshops and personal management offices. The government has the authority to have notice and to provide authorization to outside parties entering these facilities. Now, MTA required David McClure to obtain authorization prior to entering these sensitive areas, even if for the purpose of attending an employee meeting, it imposed no more than a de minimis inconvenience on his ability to speak. No request was received. It's not de minimis because the stigmatization of having only Mr. McClure obtain this extent in front of the union membership, that that, as I understand the argument, in and of itself takes it out of the de minimis category. What's your response to that? I disagree because, first of all, if he had called the labor relations manager, that didn't need to occur in front of anyone. No one needed to even know about this particular requirement for him. If he had just complied, no one might have even known he had anything, any special consideration for his entry into the property. But in addition to that, remember, his stigmatization that he's claiming is not running from the phone call himself, itself. That single phone call is all that's required, and there's no evidence that any request for permission would be denied. Therefore, for that reason, any assumed stigmatization simply doesn't add to the adversity. It could be a private conversation. And now, if there's no substantial infringement on an individual's ability to speak or a chilling of an individual's ability to speak, the circuit has found the government action simply doesn't arise to the level of adversity to support retaliation. And if the very action doesn't rise to that level, the claim is appropriately dismissed. Now, this case is controlled by ACL versus Wicomico County, in which an ACL paralegal had special access privileges to visit with inmates, and then those privileges were allegedly withdrawn for retaliation. Fourth Circuit said the jail warden's motives were irrelevant because simply withdrawing a special accommodation and leaving the paralegal with the same rights as any other individual didn't rise to the level of adversity to support retaliation. Now, the plaintiffs claim in their amended complaint that David McClure has the same rights as any citizen to visit restricted government property that belongs to the MTA. Now, the Fourth Circuit has held that it is an objective standard whether a reasonable person would be chilled in their First Amendment activities after the government action. However, the court can also consider the actual plaintiff's response to the government action and considering whether it chilled speech. While a reasonable person wouldn't expect unrestricted access to government facilities and wouldn't be chilled in performing their freedom of speech, and it's further not disputed that Mr. McClure continued his own free speech activities after this de minimis inconvenience was imposed. Now, for these reasons, there simply isn't adversity in this case demonstrated sufficient to support any claim, and the district court should be upheld on granting judgment purely for the failure to meet the adversity standard. Yeah, can I ask the question, your counsel suggests that under the CBA that you have unbridled, I think is the word to use, unbridled discretion to deny access to a union official. Do you agree that the discretion is unbridled or is there a good faith aspect that is required? No, we disagree. And the plain language of the contract... I'm sorry, I don't understand. You disagree with what? I gave you two options. You can't disagree with me. I don't think you disagree with both of them. I do not agree that the collective borrowing agreement gives the MTA unbridled discretion. Tell us why not. Well, there is a very specific provision that says, when the union requests permission, MTA shall use every effort to cooperate with that request for any legitimate union business. And there's not an incident in this case that a reasonable request was denied. Now, as counsel did admit, Mr. McClure never actually fulfilled the instruction to call one of the two individuals were authorized to gain to permit his access into the sensitive areas. Therefore, they simply can't say MTA had any bad faith or that it had any intention not to fulfill its contractual obligation to cooperate with the union to facilitate their entry onto the property when permission is sought. Now, the areas we are talking about with the meetings we're talking about, they often occur within offices, within workshops, and within managers' personal office suites, which are locked and non-public. In these areas, the government has the broadest possible discretion to exclude individuals and provide permission. But as stated, MTA has contractually accepted limits on its own authority to exclude by promising to cooperate with the union. And there's no evidence in this case that that has not occurred. And any allegation of bad faith simply has no basis in the record. Now, even if a meeting is scheduled to deal with collector bargaining matters, that does not convert the whole property into an open forum or cause MTA to lose its ability to authorize individuals entering these restricted areas. Now, it is true MTA has been indulgent in the past and has granted standing permission to union officials to enter the property without providing specific notice to an individual. Now, of course, they should contact the manager on duty before entering. However, this specific requirement at issue was only imposed on David McClure because a very specific instance occurred in which an employee filed a complaint about his threatening behavior. Tell me what happened based on the record we have before us. What happened after that hearing officer no longer worked at MTA? The MTA pulled the specific requirement that David McClure contact one of two high-level managers to authorize his entry into the property. So he went back to where he was before? No. That's not correct. So that's what I want to understand precisely. So they pulled that, but where did he end up? Well, he had all the same rights as any other union officer or any other individual, but before this matter came to the attention of management, Mr. McClure did have an electronic access key that allowed him to open locked doors without management's knowledge. Now, Mr. McClure was notified that that was being pulled and that was not reinstated. Did other union officials also have that privilege? Well, no one had the expansive privilege that Mr. McClure's card had. Two individuals had not had their cards shut off for when they left active service, so they maintained the keys they had when they were active employees. Which limited to the areas where they had worked previously, but Mr. McClure's had been granted to cover basically the entire facility. Right, almost the whole facility. Maybe not the very executive offices. I'm sorry, I'm sorry. I had thought that there were... Is he the only person that does these hearings? Doesn't anyone else come in? No, that's not correct. All the union officials. Right, and none of them had this access except McClure? He had the most expansive. Out of five, two had no keys. Two had the keys that they had when they were active employees and only McClure had the expansive key. So he took away the key permission from three people. The three people that had them. McClure, is that right? I do not know the current status, but the union was notified that all full-time union officials when leaves of absence will not have any key access, personal key access. I don't know what that means. Does that mean that the three people, McClure and the two others that had more limited, but still more access than the general public, I guess, that all of theirs were eliminated? That's correct. Or at least they were told it was going to be eliminated. What you're saying is you don't know based on this record whether that actually was carried out, but the intention was expressed that they were going to do it. Correct. And that was this electronic thing that allowed you to enter management facilities whenever you wanted. Is that basically right? If you have the key to the office, yes. And Mr. McClure's key had expansive access to many offices. Let me go back to the very first thing that Judge Richardson asked you about. Once the hearing examiner retired, was the requirement that he obtain permission to come onto the premises, was that rescinded? Yes, the specific permission to call one of two individuals. Now, of course, without the key, you would still need to knock on the door, make a telephone call to enter the facility. But that once the hearing examiner left, for instance, if he came on the property and had not asked permission first, would he be considered a trespasser? No. Okay. And am I right that the record does reflect this idea that at least one of the reasons that was happening was so that they could place a guard in the hearing room with Mr. McClure? It was not to place a guard, per se. It was to ensure the separation between Mr. McClure and the individual who's complaining about safety. I thought there was something about a guard in the record, too. There was, too. But you're telling me not? No. I mean, depending on the behavior, that would be possible, but that's not in the record. Gotcha. One hour. So do any other people... have an access key as Mr. McClure had? Not... There would be individuals, high-level managers... Yeah, yeah, yeah, non-employees. Union members. Oh. Not even... vendors. I don't know. Other people that are non-employees. No, you're right. It's possible a particular vendor would have access to a storage room for deliveries, but not expense of access to the property. No. And indeed, employees, their key card generally is limited to their work area. So if you're assigned to whatever it is, Bay 3, I don't know what MTA looks like, but Bay 3, your access is Bay 3 limited. It doesn't give you access to the other bays. That's correct. That is correct. And now, moving on to the Fourth Amendment issue. Now, we have touched on this, but when Mr. McClure lacked the authorization of the individuals who were identified to permit his entry, he was a trespasser on the property. Now, MTA took no effort to try to either trick him into a misstep and call the police after several confrontations where Mr. McClure had not followed the instructions. Only then, on two occasions, after Mr. McClure had failed to follow the instructions, police were called and only requested him to leave the premises, which he did without any conflict. There was no arrest, no criminal charges. There was no conspiracy to go out to get Mr. McClure. Purely on this record, he simply refused to follow reasonable instructions that were not a large burden on him to enter the property. Who were the, were they Baltimore police officers or agency police officers? One was a transit administration police officer when an incident occurred on transit administration property. Another was... That's the same as the MTA? Yes. All right. And then second, there was a member of the police force from the Department of General Services, which owns the office building where the main administrative offices of the agency are located and some employee meetings are held. In that case, the general services police arrived. Is that a different agency from the MTA? Yes. So when you enter this building, is there, you have to go through security? Yes. There's a guard desk at the main office building controlled by the Department of General Services. And individuals... Members of the public come in here and they have to go through that? Yes, that's correct. They show identification, identify their offices. In the case of some offices, escorts are sent down to the first floor to take them to the office. Now, David McClure seemed to argue that he had the right to enter for whatever reason, but the Supreme Court has said in Adderley v. Florida that nothing in the Constitution prevents enforcement of trespass statutes against those refusing an order to remove themselves. Now, in that case, individuals were protesting on jailhouse grounds and they claimed that they were immune from trespass laws because they were exercising their First Amendment right. Well, the Supreme Court disagreed and replied the often established proposition that the Constitution does not provide individuals the right to speak whenever, however, and wherever they please. And Mr. McClure had no right to do so in restricted spaces without the authorization of the agency that controlled the process. Can I ask you one other factual question? Now, Mr. McClure doesn't have to call in advance, is that correct? Not specifically, of course. What do you mean, not specifically? Generally, does he have to? If he enters a gate or a lock or a door, he would have to call someone, but there's no specific requirement placed on him to call an individual to be permitted on the property. And is that the case of everybody that comes in the property? Yes. So he's treated like everybody else in that respect? That is correct, that is correct. Well, Your Honor, I do have some time if you have any other questions. I believe we've covered all the areas. Okay, thank you very much. Thank you very much. Your Honor, I used up all my time, but I'd be happy to address two factual questions. First of all, all the officers except Mr. McClure have FOB keys that allow them to go onto the property without the employer's consent or prior permission. And the second thing I wanted to point out... Is that in the record? Because your colleague has just told me, no, he's treated like everybody else. It's not in the record. But the statement that he gave is not in the record either. So this is a motion to dismiss. I just want to tell the court, we disagree with what he just said. Factually, that's not true. What is true, and where we do agree with him, is that Dave McClure can now go to grievance hearings without getting union permission. And also, while he was banned from... Without getting union permission or without getting an EPA? Without any employer permission. He can just show up. They withdrew that on the eve of a preliminary injunction hearing on the ground that Ms. Estina Holland Brown had retired conveniently. So they were withdrawing the policy. Therefore, there was no need for a preliminary injunction hearing. Since then, he's been able to go on without getting any permission, just as he had before. And all through the period that Dave McClure was barred, all the union officers, except Dave McClure, always went and conducted grievance hearings. They didn't ask for permission. This notion about permission being a condition of getting onto the property is just not factually true. And that's one of the reasons we were trying to take discovery. The district court denied our right to take discovery so we could have made that record. And if you read this provision about union business, it will show the union's position that this paragraph relates to business conducted on MTA property or MTA's paid time without the permission of the department head. They're talking about employees being on the clock, being paid by MTA while they are doing union business. And that requires permission. The second paragraph refers to officers on leave. And no permission is required for them. All that the second paragraph says is the union further agrees that its officers, while on leave of absence, Mr. McClure, shall comply with all MTA regulations pertaining to entry into any part of MTA's premises, vehicles, or other property. That's the provision that applies to them. This provision up here is about getting permission for people who are active employees to do union business, even though the employer is paying them while they're doing that. And in that case, there is a provision that says, it's understood that every effort shall be made to cooperate with such union if such permission is sought for the purpose of legitimate union business. And that union business was union elections, preparing for grievances, looking for safety violations like Mr. Clure was trying to do. It's just not true that this provision had ever been applied, ever been applied to a union officer who was on leave, who was coming in to conduct a grievance hearing. And that's why we were trying to take discovery to show how erroneous this was. We were denied that right. And we're in this position in the Court of Appeals where the court is trying to guess how a labor provision was implemented or what it's supposed to mean. I think it's clear on its face, but it does need some context. And we didn't get the opportunity to provide that context. Thank you very much. We will come down and greet the lawyer. We'll ask our clerk to adjourn the court, and then we'll come down and see the lawyer.
judges: Diana Gribbon Motz, G. Steven Agee, Julius N. Richardson